24-13547. Mr. LaRoe, for the appellant, Mr. Abbott for the appellee, Mr. LaRoe, whenever you're ready.  May it please the court, Luke LaRoe on behalf of the African People's Education and Defense Fund. We're before the court on an order that dismissed an amended complaint with prejudice that certainly was submitted in good faith to pursue the rights of the African People's Education and Defense Fund in the county's efforts to deny their application for an ARPA grant, the American Rescue Plan Act, which was designed to assist small nonprofit groups that had suffered the devastating effects of the COVID pandemic because people just weren't making donations and it just wasn't time that people wanted to participate in those kinds of issues because of the distractions caused by COVID. I think, speaking for myself, I think we kind of understand how we got here. You've got limited time. You've got a lot of ground to cover. I would go ahead and start in on whatever issue you want to start on. Well, let's start off with what we felt was the reason that the county denied this application. I think, obviously, the genesis of the argument came from Commissioner Latvala, right out of the box. He sends the list of everybody that applied to one of his assistants and says, look into the African group. No reason why, no distinction why. It was our perspective that as that developed, that it showed that the county denied this grant on the basis of what they asserted, clearly on the record, was an association with the disfavored group. And I know that the arguments about the entitlement to government benefits go different ways, but in this instance, I think that there's a dramatic distinction between the cases where somebody's making a bid to build something or looking for employment. This was a grant procedure. This is something that... Let me ask you this, because this is a point of confusion in my own head. It seems like the grant... It seems like there's a line of grant cases, Rust, Finley. Yes. Then there's a line of, and maybe those are sort of programmatic cases, and then there's this line of kind of one-off cases, the Umber line of cases, which they're about sort of employees or independent contractors or whatever. Those two lines of cases, so far as I can tell, they don't tend to talk to one another. What distinguishes those lines of cases, and which line does this case fit in? Is it a Rust case or an Umber case, in your mind? I think it has characteristics of both, but I... The reason I guess I ask is that if it's a Rust case, it seems like there the plaintiff has a claim, but the bar is very high. I think you would probably acknowledge that. Yes. In the Umber line of cases, now we've got a question like whether you've even got a claim, whether you're the type of plaintiff that even can partake of the Umber line of  That's why I wonder which one you think applies. That's why I think it sort of borrows from both of those different types of cases. The issue in both those cases is that the denial can't be absolutely predicated on an unconstitutional decision. From our perspective... Yes, they're both kind of unconstitutional conditions cases. I guess my concern for you is that if you're in the Umber line of cases, speaking for myself, I've got some doubts about whether you can sort of weaponize that line of cases because you're definitely not an employee, and it doesn't seem like you're an independent contractor with any kind of existing commercial relationship. No. The distinction from my perspective is those cases are all with some entity or person that's going to provide services to the government. The government can decide, I don't want to hire you, I don't want you to build this bridge, I don't want you to do this. This is very different because the ARPA grant is predicated on an application that showed that you suffered some kind of detrimental impact from not making any, getting any contributions because of COVID, which certainly in both of the applications, the one that was the subject of a contract that was signed by the people associated with the APDF for the radio equipment, and then the second one, which was for a generator, which was designed to assist both the radio station and the kitchen, which apparently would feed many people in the community, homeless people, things of that nature. So I think that these, the distinction is that this goes back beyond just coming in and saying, hey, can I have a job or can I fill this out so you might pick me over other people to build a bridge. This is more the grant that was predicated on a very elaborate evaluation and review of not one, but two applications. And I think that the differentiation here is that there was a rating process by the Pinellas Community Foundation. Nothing like those other cases. And that the Pinellas Community Foundation found, certainly for the first grant, you know, coincidentally, number four out of 55, and the design of the ARPA awards were predicated on those small nonprofits that made the best case, that submitted the best applications. They got their contract, they signed it. So I think that's different than just saying, well, we don't want to hire you. They went through the entire process, and the process was evaluated, and it was evaluated in a very positive way. So we're beyond that decision-making level of whether you want to hire somebody to build a bridge. We've already gone through the process, so we've made it to number four. Okay. So let me ask you this. So it sounds like, and I don't want to put words in your mouth, but it sounds like you're saying, okay, you might be right that MBEAR sort of applies only if you're an independent contractor with an existing commercial relationship, and you say, we're not that. We're not the bridge builder. And so what's, like, the case at the end of the sentence? Like what's the case that you're citing to us that provides the governing sort of metastructure? Is it Rust and Finley? Because if it's Rust and Finley, it seems that the court says, you know, the bar is very high. It's got to be, you know, an effective prohibition, coercion, something like that. Right. And I think we reached that level. Okay. I think that in the briefs, there's an Eighth Circuit case that we've cited Wischnoski. And I think even the briefs say, well, you know, the Eleventh Circuit has come close. They've cited some of these other cases. But we haven't really gotten to the level of the holding of Wischnoski that just said that the government may not deny a benefit to a person on the basis that it infringes his constitutionally protected interest. And I think that that's really the overarching consideration here is that what other reasons would they have to deny this? It takes it out of that sort of, you know, the discretionary arena that a government can make their own decisions. And I'm not saying anybody's bound by this. They can make the decisions they want to make. But the whole process here was the evaluation, the review of the applications. This application was deemed dramatically superior to most of the other applications that it received. So we're going beyond just that pick and choose at the lower point. We've made it to that level. We've been, you know, given a contract for number one and applied for number two. And quite honestly, the only reasons given were, from our perspective, racially based. Can I ask you, I want you to be able to talk about your race thing, and I'm sure that you'll have more time to do that. But on the First Amendment issue, just to follow up on something Judge Newsom asked you about, it seems like under Rust, for you to have a First Amendment claim, you need to identify some effect that it's having on, and correct me if I'm wrong the way you read Rust, but it seems like you need to be able to say, look, they put this condition on there that's based on our association, that's based on our speech rights, and it's such a condition and it's such a program that it's going to actually have an effect in the real world about whether we speak or whether we associate. Do I read Rust correctly? I think you do. But here's the distinction. Because from our perspective, it's not the forward view of being deprived of the First Amendment right, it's the fact that the money being sought to continue in the expression of First Amendment rights, the community programs, the healthcare programs, all of the things that the APEDF does, this grant was supposed to assist them in that. Right, so on that, that's like a very interesting issue. So is the fact that it's like a radio program, I mean, I believe one of these is for radio equipment or something like that. Very much oriented to the radio. Is that the relevant consideration here, that you're sort of asking for the money for your own speech? Like how do we draw the line between, I mean, it's not that much money, I don't think, and so there's like, it's not that much money, but yet it has some like real impact on your ability to exercise First Amendment rights. I think that the distinction here that's really important is that it's not so, again, it's not prospective in the exercise of First Amendment rights, it's what was the reason you were denied? The reason that this grant was denied, the first one revoked, the second one denied, is specifically because of associational rights that even in the terms of Commissioner LaValle, they're associated with this other group. That group was not the subject of the application. So by looking backwards, you have retaliation claim, essentially, and you're talking about a penalty for the association. Correct. Not how it's going to necessarily affect you in the future, even though it can have a chilling effect for future matters, but at this point, you're saying retrospectively, we were penalized. Correct. Let me ask you a question, and I'm going to ask the other side as well. Did the trial judge actually rule that you had to have an ongoing relationship in order to have the First Amendment claim? I think it's unclear. I'm looking at page six of his order, and he says, plaintiff did not enjoy a preexisting and continuing contractual relationship with defendants, best described as a first bidder, et cetera, et cetera, and he cites the clinic, but he never really rules, it goes on and says, assuming arguendo, that plaintiff can assert some sort of First Amendment right, and he goes on to say, I don't think they properly pled one. So did he or did he not make that ruling? I think, again, we get back to that level, I think the ruling was backwards. I think it was, you know, what's the continued association? Well, obviously, it's... Okay. I don't want... But is it a requirement based on the trial judge's ruling? And then, of course, we have to decide that as well. But did the judge below actually say, I find that they don't have a cause of action because they don't have a continuing relationship? I don't really... I mean, it could be read that way, but it's very vague. I'm just curious what your position is. I don't think that's clear at all. I totally agree with you, and I think that the question here is that there's this general associational concern that's never really established. I mean... Don't we have to decide that issue first before we go to the next step as to whether you actually have an alleged cause of action? I think so. And, again, you get back to the whole de novo review of a 12b-6 and, you know, the complaint having to be taken as true and all the rest of that. Well, the area of whether you have to have a continuing relationship is still being boiled around various courts. McClintock, for example, indicated there was, but it was a two-to-one decision. Judge Roth gave a very, I thought, very persuasive dissent. And then you've got the Wisniewski, which also, I mean, there was a dissent, but I think it was on a different issue. And then there's a case in the Fifth Circuit that found that you didn't require that. I don't think the facts or the contents of this order rise to the level of specificity that those other cases talk about. I agree with you. The other case, the Fifth Circuit case, is Oscar Rendo Contract Incorporated v. City of Lubbock, Texas. In all those cases, those are very specific. You're associated with this, as opposed to this whole reference to the Uhuru Movement and other issues, again, outside the four corners of the complaint, that are just, you know, not only are they not specific, they're speculative, and we disavowed a lot of the accusations that were made against the Uhuru Movement that were relied on, clearly, by the records that we got from the county. So. Do you want to talk about your race claim? Do you want to talk about your race claim as well? Yes, and that, to me, seems like the most simple argument to respond to. I mean, if you look at the admission statement of the APEDF, if you look at everything related to them, the fact that the court would find that we didn't properly allege some kind of racial connection. We cite the cases that say, we don't have to be 100% black, we can have members of all different races, all different nationalities on our board, but look at the mission statement. What is this organization about? It's to advance and help protect the civil rights, the human rights, of the African American people. Can I ask you a question, and I hope this is not indelicate, but the mission statement refers to the human and civil rights of the African community, and the disparities faced by African people. So does that include North African Arabs? I don't know that it does. Why? I, again, you're trying, you know, you need, in this case, for us to impute a racial identity to the organization, and you just said, sort of, never mind the makeup of the governing board, in effect. Correct. I've got the mission statement. But if it's the mission statement that we're looking at, I'm not really sure that gets you racial identity, anyway. Might get you, like, sort of geographic identity, but I'm not sure it gets you racial identity. Let's fall back again on the application. The application clearly identifies the community that the APEDF serves. It's the black community of South St. Petersburg. They go into great depth in the application of describing the 100,000 people that they serve that are in an underprivileged, rather, I'll say, destitute area of the city of St. Petersburg that is, if not predominantly black, almost entirely black. And it's that. This is a motion to dismiss, right? That's where we are? That's where we are. So we need to take all, everything, sort of, in your favor as the plaintiff and the person responding to the motion. One would hope, yes. So one reasonable inference from, I mean, it might well be that at summary judgment. Right. And I totally understand that. You don't have a special identity, but at this point, you just have to ask, like, whether a reasonable person could. With all due respect to the trial court, I don't think there was any question that we made the appropriate allegations in the amended complaint to establish the racial characteristics of the African People's Education and Defense Fund. What do you say about, so one question I have about this is, so Arlington Heights has that language in it, I think it's Arlington Heights, where the Supreme Court says, like, you know, corporations probably don't have racial identities. Are you stuck pursuing, sort of, a racial identity for the corporation, for the organization? Or is this a situation where you're bringing, really, like a cause of action on behalf of, like, members? Like, how are we supposed to think about this? Does your organization need to have a racial identity, or are you able, like, for example, let me, usually when the NAACP sues, it's on behalf of members. Right. So they don't need to establish, sort of, a racial identity for the organization. Where are you in that? Well, we're in a different place. Obviously, the APEDF doesn't serve itself. It serves that community, that community that was described in the application, which has very distinct and clear racial characteristics. So from the perspective, and certainly what was alleged in the complaint, is that this is the community we serve. This is a racially distinct community. It's largely African American. And then we go into the reasons why the original grant was revoked, and the second one was not given. Those were racially biased determinations on the issues that were blown out of proportion. They started off racial, and then there's, I think there was one email that says, oh, they're alleging discrimination. Let's say that they run political parties, or something that's not allowed for a nonprofit organization, and then, quote, it ain't my first rodeo, as if we're going to get out from under this discrimination claim by giving different explanations. A later explanation was, you didn't connect any of your concerns with the COVID pandemic, even though they came in number four out of the multiple other applications. So the explanation changed to try to avoid what was clearly, from the get-go, a decision based on the racial characteristics, not just promoted by the APDF, but perceived by the county commission. Can I ask you just a question about that? Like, even if we sort of get through the racial identity threshold issue, and now we're into the guts of the claim. So, Vala's texts are clearly kind of the third rail here, right? They're kind of the smoking gun. What in those texts screams race to you? Like you've said several times, like, from the very beginning, couldn't read them any other way, had to be race. But I mean, I guess as I look at them, they're kind of coarse and gross and ugly, but I guess I'm not sure that they're sort of like infused with racism, instead it, you know, it seems to be, there seem to be concerns about, you know, sort of other things that the FBI raid, the anti-Semitism, whatever. Like, so why is it necessarily race? Well, I think you have to go from the very outset. So what Vala takes a screenshot of what appears to be all of the applicants. That was in the text that we got. And he doesn't ask about any other applicant, doesn't describe them in any other way than Google the African people's one.  Why Google the African people's one? I mean, there's no explanation. There's no identification of concern. And then it says- I thought one of your major issues was that it was an associate, you've got an association case here. And I thought it was the URA movement. Uhuru. I thought that was the basis of your claim that it was racially motivated. That's what it, that's the associational issue here. But from the outset, it was, from our perspective, there's no mention of the Uhurus right out of the box. But isn't in the emails it is, isn't it? And that's the response given to the question about the African people's one. Well, that's the Uhuru house. Obviously the Uhurus are involved in another case outside the four corners of our case. I thought the essence of your case was that it's racially motivated because they are associating us with the Uhuru who we don't particularly care for. And that's absolutely correct. It's pretty straightforward and basic to me. From the absolute foundation, what was the very first question asked? Google the African people's one. To me, that suggests that there's some racial consideration involved in, in distinguishing them from every other applicant. But it seems to me this might be something for summary judgment, but not necessarily here on a motion to dismiss. And I can't disagree with that. We just felt that we had a long way to go to get dismissed with prejudice on what we felt certainly were allegations that supported the causes of action that we were trying to pursue on behalf of this organization. Ask another question about the racial discrimination thing. I don't want to take this too far over your time, but just to press on one issue. So go back to the issue of sort of your membership, the community that you serve. Would, would a organization in your mind be able to bring a race discrimination claim? Let's say it's the Catholic Church. Right. So it's just like there's no racial sort of connection with the entity at all. But this particular parish serves, you know, a African American area, right? And so that's kind of like their ministry area. And you know, a lot of the members of this parish are African American. And for some reason, you know, a city says they can't do something right. Can that organization bring a race-based discrimination claim? Not unless they're called the Black Catholic Church. That to me. Well, that's, I guess that's my, like, I'm trying to figure out, like, is it, is an important, when we're trying to figure out a racial characterization for an organization, is it important what the organization's characteristic is, or is it important sort of the people that, you know, they serve or they're with? That's my... I'm going to answer it this way. In the context of an ARPA grant, where you're designing something to help nonprofits assist their community, I think it's both the characteristics of the entity making the application, but also the community it serves. I think those have to be melded together in order to give you the exact overall racial characteristic. I know it's hard to define, but, you know, I'd like to think that instinctively it does satisfy that threshold of establishing a racial connection necessary to pursue the causes of action that were raised.  You've been very patient with our questioning. You've got rebuttal time coming, but let's hear from the APALE, Mr. Abbott. Thank you. Thank you, and good morning, and may it please the Court. My name is Dan Abbott. I'm the attorney for the APALE Pinellas County. I know the Court has many questions, but let me just start with count one until I'm directed otherwise. Count one of the three-count complaint was the complaint for violation of expressive association. There were some questions to the Court. You've heard some arguments in terms of whether or not this is an umber barred complaint. Umber, of course, the Supreme Court case that says those without an existing commercial relationship with the government are not protected by the umber decision, and you heard about the McClintock case. You're saying that the Supreme Court ruled that, just as you said, that they are barred if you don't have an existing relationship? No, sir. I hope I didn't overstate that. I will say this. The umber court expressly emphasized the limited nature of its decision and expressly noted that that decision did not extend to bidders or applicants for a new government contract. I think what they did was they let that question open. They made, that's one way to read it. Another is to make expressly clear that their case should not be read to apply to the. I heard courts that have interpreted it the same way, and I interpret that way. They let that issue open for the next case to come to play. I don't mean to quibble with you. They certainly did not decide the issue. They did make a point, rather than not mentioning it at all, the Supreme Court made expressly clear that they didn't want the opinion to be read to afford protections to those without a preexisting relationship with the government. Can I ask you just a question about that? Why is that exactly? What's the anxiety? Because we allow, like in the Pickering scenario, we allow applicants to bring First Amendment claims, employment applicants. Why on the independent contractor side, suddenly all the anxiety about applicants and bidders? Just opening Pandora's box, is that it? I can't tell you, Your Honor, what the majority decision in McClintock, what the third district decision is, is that they expressly say they find the distinction to be rational because to go further would be to cause the judiciary to intrude into the traditional legislative function of awarding contracts, is the wording that they used. They thought that the Supreme Court drawing the line where it was made sense, and they intended to further enforce what they read to be the line. I will go further. This is not awarding of a contract, per se. This is awarding a grant. This is not entering into a business relationship with the plaintiff. True, but I would suggest a ... Similar to the subsidy in the case you rely on national endowment. Yes, sir. That was a subsidy. Yes, sir. Subsidy seems to me to be similar to a grant. Almost the same thing. Yes, sir. Yes, so this kind of goes to my question. Is this like fundamentally a Rust-Finley case or an Amber case? Well, I'm not sure that the line of cases are necessarily inconsistent. In the Rust line of cases, I think those were entities with existing relationship with the  government. They were existing, ongoing grant recipients, and then the government imposed new conditions on continuing those grants. So I don't find it to be the least bit ... Isn't the issue here ... Yes, sir. I mean, this is just one way. I'm not sure if I necessarily agree with this, but it seems like one thing that courts seem to be doing here is the question for an unconstitutional conditions case is, is the condition going to affect people's free expression and whatnot in the real world? And if you've got an independent contractor that's built his business around serving the government, and all of a sudden the government comes in and says, like, now you can't, you know, you can't, I don't know, give money to the Democratic Party or whatever, then that contractor's going to say, well, I guess I can't do that because I have to continue serving the government. Whereas, if you just got someone who's bidding on a contract for the first time, you know, it could be that the contract's so lucrative that they're going to affect their expression. But it might be that, you know, look, we just wouldn't really expect someone to modify their expression based on the theory that they could potentially get a contract. Is that kind of the idea? I think that makes sense, Your Honor. And in fact, even Umberg talked about sort of the history of how the law developed. Initially, we only afforded First Amendment retaliation protections for government employees. And then in a decision, we extended that to applicants for government employment. But certainly, we have always drawn the distinction from those who have an existing relationship with the government. And as Your Honor points out, perhaps a reliance upon that continuing relationship versus people who have never rationally relied upon government resources. Here though, it seems like, and so, if that's the case, why isn't the fact that they actually got the contract, why doesn't that make them more sort of like a government employee who then you fire because of something they did out in the world, as opposed to someone who's just kind of bidding, and they don't really know whether they're going to get the contract or not, and they're probably not going to like change their conduct out in the world on the theory that they might get something. Well, Judge, they never got a contract here. Well, didn't they win the right to it though? I thought that was how the first one went. On the first one, they were initially given the award contingent upon the execution of a contract. The draft contract expressly said that the contract does not become effective until it's signed by both of the parties. And under Florida law, as we've cited in our brief, and really has unrebutted in either the appellant's brief or its reply brief, that is not a contract under Florida law. But it seems, I mean, I don't know that we need that for the coercion angle. I guess if we're concerned about unconstitutional conditions and the coercion of First Amendment expression, it seems like, you know, your best case is I'm out there, I'm just bidding on stuff, who knows whether I'm going to get it or not, whatever, thousands of people want this money, I may get it or not. That's your best case. Their best case is I've been getting the money forever, you know, and then you take it away. It seems like the fact that the government has said like, here's your contract, we're ready to give this to you, you have to disassociate yourself from the HRU movement to get this contract. That seems pretty coercive, I guess. Well, but that's, factually, that's not what happened, Your Honor. The contract was not offered with that exaction attached to it. It was an offer to contract that was withdrawn before we had a contract. Yeah, but it's, I mean, it's the same principle, though, right? I mean, you weren't willing to let them get the contract by disassociating with the HRU movement, but that was the condition attached to it that allowed you to withdraw it. Well, I don't mean to quibble, Your Honor, but I don't think it was a condition. It was an initial thought that was never formalized in terms of a contract, and with the distinction Your Honor drew earlier, maybe we are more sympathetic for those who have contracted with the government, those who are relying upon government resources because of a past commercial relationship. Certainly that didn't happen here with an unsigned contract. Radio equipment wasn't bought and a backup generator wasn't bought in any sort of reliance upon a contract with the government because no such contract existed. So they are really no different than any other unsuccessful applicant. They put in an application, they didn't get a contract with the government, and they fall squarely within the umber, what this court has called the umber bar in the Mangieri versus DCH Healthcare Authority case while they distinguished the third district opinion in McClintock because there was an existing long-term relationship. This court commented very favorably upon the third district analysis and commented that because of the long-term relationship that Mangieri had, he was not subject to the umber bar that would have otherwise precluded him from making a First Amendment expressive association claim. That was a commercial situation as well, right, as opposed to a sub-grant or a . . . That was, I believe he was a long-term anesthesiologist for a government hospital. And the issue was whether that created an ongoing . . . Yes, sir. They didn't directly rule again on the umber issue that kind of suggests they might, but it was not directly . . . I believe the language of this court recognizing the . . . I'm sorry, Your Honor, were you . . . We relied a lot on National Endowment for the Arts . . . Yes, sir. . . . proposition that the denial of a grant, in that case they called it a . . . did not rise to a First Amendment violation . . . Yes, sir. . . . because they imposed a condition of decency and respect to the community standard. Yes, sir. Right. But then, after they made that ruling, the Supreme Court posed a hypothetical, and I'm going to read you what it says. If the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then we would confront a different case than we had there. We have stated that even in the provision of subsidies, the government may not aim at the suppression of dangerous ideas. Doesn't that suggest to you that the case you're relying on . . . No, sir. First . . . . . . I think subsidies are quite similar to a grant, and it's more akin, more analogous than any other case we're talking about, the hiring cases and the existing contract cases. Excuse me. It's involved, the subsidy and the grant, I think are the same. Yes, sir. That's not the distinction I would draw. I recognize that a grant is similar to a subsidy. No, the distinction I would draw is even with those dicta comments, which, of course, was not the issue in that case, but to the extent we're taking a signal from the Supreme Court, what happened here was not the . . . would not qualify as an effort to suppress unfavored speech. Now, I know that we've kind of spent most of our time here talking about whether or not there is an umber bar, but as you, Judge Huck, pointed out, the trial court judge at least ruled on another ground, maybe on that ground and an additional ground, but . . . Do you think he ruled on the umber? Yes, sir. I'm confused, but it doesn't make . . . it's not clear to me. I would say it's not crystal clear. I would say the judge underwent the analysis and said, notwithstanding what seems to be an umber bar, I find the pleading to be insufficient. I will say this, though, Judge Huck. African peoples must think that that's what the lower court did because it's the first section of their brief. The first section of their brief is the lower court erred in holding that we were umber barred. We haven't reached that, whether the lower court reached it or not. This court has to reach it. Is that right? I'm not sure I agree . . . I mean, I would assume your position is, look, I don't have to die on that threshold, Hill, even if you assume they've gotten an umber claim, I sort of don't think they've properly alleged one. Certainly we have that. I'm not sure you could not affirm the decision based upon umber, even if that was not the basis of the lower court's decision. But certainly I agree with your comment, Your Honor. Certainly what the judge did, maybe in addition or maybe instead, was these pleadings are certainly insufficient, and they really are. The claim is for an expressive association claim that's very strange because no real association is alleged in the complaint, and that's really the primary basis of the dismissal because where are the allegations in the complaint regarding who is the association with? I mean, it's not contending that the conditional grant was rescinded because of an association with a person or with an organization or with even people within EDF. It's because Uhura is not an organization or a person. It's an attitude. So it's a claim that they want to freely associate with freedom or whatever that means. And where are the allegations in the complaint with regard to the joint First Amendment protected activity that there was an association with? In other words, what do the Uhuras and your plaintiff do together to jointly advocate their First Amendment rights? Isn't the issue that, I mean, and maybe this is, it seems like what they're saying is that we were denied this grant because the county thought we were associated with the Uhuras. We're actually not. And like actually the Uhuras, like they don't, the county doesn't understand what that is, but it's sort of a, it's guilt by association and the county also just doesn't get it right. Why isn't, why isn't it, why isn't it still, like, let's say that, you know, someone denies you some contract because they believe that you're associated with like the Libertarian Party or something. And you're like, well, I'm not associated with the Libertarian Party. But still couldn't you sue and say, you can't deny me the contract on your belief that I'm associated with the Libertarian Party. No, sir. I don't think that.  I don't think you can adequately state a freedom of association claim. The premise of those claims are the government kept you from freely associating with those you want to associate with, either within your own organization, in other words, imposing rules that restrict you from associating with those who you want to associate with. Or maybe other people or other organizations. But here, they completely disavow all of those relationships. I mean, what is the joint First Amendment protected activity? The allegations are, we don't have anything to do with those folks. And so what is the association? It says, those people are anti-Semitic. Or those people want to consult with another government. We don't want to associate with them. So the complaint just affirmatively, and this is at least the primary basis of the district court's decision. And where are the allegations regarding that is the association, that joint protected activity, whatever the protected First Amendment activity is, is the basis for the denial. I mean . . . So let me ask you this, because what I thought you were going to say is, Judge Brasher raised the point earlier that if you look at Rust and Finley, and to a certain extent, the Umbera line of cases as well, they require some sort of, I think, a pretty high bar of coercive effect in the real world, some real penalty in the real world, that it effectively prohibits you from engaging in the sort of association that you want to engage in in the real world. And so what I thought you were going to say is, like, there's nothing in the complaint about the effect, sort of the real world effect, even if there is association, even if there is causation, that there's sort of no effect in the real world. But that's not quite what you said. Well, it's not . . . I didn't quite get there, Your Honor, and I see my red light blinking. Well, we're going to give you a little bit of . . . I was going to . . . four or five reasons, the most . . . assuming there is no Umber bar whatsoever. We're just looking at the validity of a well-pleaded complaint. There are any number of reasons why a First Amendment retaliation based upon freedom of association is not properly alleged, including the comment that Your Honor made, but including the association and the joint protected First Amendment activity. There are allegations about what the plaintiff does. There are allegations that what the Uhuras do are something different, but there are no allegations about what they want to do together. And that's the essence of just a classic association claim, and that's what the judge found was insufficient. I'd like you to talk about the equal protection claim, too. Yes, sir. And, you know, in particular, one, I guess I read the district court's decision to have said two things. I think it said, I'll assume they can, like, make a race claim even though they're an organization. And then it said, but they didn't make a race claim. Yes, sir. On the first issue about whether an organization can kind of make out a race claim, like, why can't an organization have a racial identity or some kind of a puted racial identity? A fair question, Your Honor. I will just say this. As recently as 2023 in Sheba Ethiopian Restaurant, this court has held, we still haven't decided whether or not a corporation can. That was an unpublished decision that was about qualified immunity. I was on that panel. I know a lot more about that case than you do. I'm sure you can give me your own. But, you know, that's a question of qualified immunity, clearly established law. This is, the issue has come before us. There's an argument being made that corporations or associations can't have racial identity. And I guess my question to you is, like, why is that a correct argument? I wouldn't, I don't know, Your Honor. It seems to be a matter of debate. I just announced matter-of-factly that this court has never decided that. But, like, you wouldn't deny that, say, you know, sort of a mom-and-pop shop that's entirely black-owned, that is, you know, sort of entirely black-controlled, and that serves the African-American community, and that has a mission statement that says, you know, sort of black empowerment. Would you deny that that small, closely-held corporation has a racial identity? The first thing I would say is it has never been decided. I would just announce matter-of-factly that this court has never decided that a corporation can have a race. Let's assume it can't. And who has standing there? In this case, who has standing if African people doesn't have standing? I wouldn't suggest anyone else has standing. I would suggest that— If there is a theoretical violation of constitutional rights and there's nobody who can bring that claim. Well, we would have decided that there's no violation of rights. There can't be a violation of a race-based equal protection if there is no race of one of your applicants. But I don't mean to duck the, I think, what the guts of the question is. Can a corporation be black? Well, again, the lower court underwent an analysis because some courts have discussed what if a corporation can have a race, how do you determine it? And it is things like, what is the percentage of the people that run your organization? What are their races? And in this case, the complaint affirmatively alleges that one member of the board is black. Now, they don't affirmatively go forward and say how many members of the board there are. It says the president is black. The president— Most of the board members are black. No, sir. It does not say that. In fact, it says the opposite. The president is a member of the board. The complaint alleges that the president of the board is black. It does not announce how many members of the board there are. If you dig into the backup materials when the application is submitted, I think you'll find that there are three members— The complaint, what does the complaint say? The complaint says the president of the board is black, and it says that the program director of the radio station is black, and it says— Doesn't it also say the most of somebody? Is it most employees? It says most of the employees and volunteers, and it says the constituency that we serve are mostly black. On the last of those working backwards, the court has decided that the patrons of who you serve does not go to the race of the corporation. That's the Prestige Restaurant cases. That's a commercial situation. I think we have a different situation. We don't have a case where someone has a contract and they want to make profit in their business and they're denied because of some violation of their contract. This is a nonprofit group that is fostering an ideal or an idea of a particular group. It seems to me that's totally different than a commercial situation. I have never seen a court in discussing the race of a corporation draw that distinction. Right. And all these decisions about whether you have to have ongoing business relationships, the ones that go that you do have are all commercial. And I think there's a distinction. I think it's a policy decision. Perhaps so. I don't know why what the corporation's business activities does has any bearing on what race we deem that corporation to be. Let me ask you another consideration that I'd like you to address. Should we care about the perception of the discriminator, right? So maybe the discriminator, you know, the discriminator, the government, I guess. Maybe they're wrong. Like, I mean, you know, I'll just speak for myself. I see employment discrimination cases all the time where someone sues and says, I was discriminated against on the perception that I'm Hispanic. You know, we don't require them to like prove their Hispanicness. It's the fact that they were discriminated against based on racial characterizations that the employer sort of imputed upon them and said, like, you know, I'm discriminating against you because I believe you to be Hispanic. Why isn't the same thing true with a corporation? Like if the if the government says the reason we're taking this action is because we perceive you to be of this racial characterization, why isn't that enough? And just like, look, if the government perceives them to be race, sort of a race-based organization, we don't, who cares who their CEO is? Who cares what, like, why would we even care? Like, why shouldn't we just look at what the government says? I would say, first of all, Judge, the facts don't support this. In fact, if you look at the facts that are relied upon here, the statements don't show any racial animus whatsoever. But to further . . .  Wait a minute. You keep saying that. The facts, the facts. But we're talking about the allegations. And I promise, Judge, every time I say what the facts are, I am referring to the allegations of the complaint. I am not going outside of the complaint whatsoever. To further answer your question, Judge Brasher, violations of Constitution are intentional torts. So in the employment context, it is frequently the case that an employee is discharged for a mistaken but non-discriminatory basis. And those employers are held not responsible for that discharge. Because even if they are mistaken, I'm firing this employee because they were late for work. They weren't late for work. We don't hold those employers responsible. Here, if the county did not know or did not believe that there was an association, they can't have committed the intentional tort for basing their decision on that same thing. Could you address the second part of this equal protection claim, too, which I think is what the district court was really saying here, which is that even if you can bring one of these kinds of claims, as an organization, there's just not enough in this complaint to kind of make a race-based claim. Yes, sir. I would love to. Thank you for the opportunity. We began to talk about assuming arguendo that the plaintiff can have a race, what are the allegations for what their race is. But for an equal protection claim, you have to show that you're different than your comparators. So what were the allegations in the complaint with regard to the successful grant applicants and whether or not that shows a racial animus against black applicants? The only allegation in the complaint, as noted by the district court, is that four of the 34 successful grant applicants were not black-led and not black community-directed, which means that insofar as the allegations in the complaint, and again, Judge Huck, I am bound by the complaint and I wouldn't suggest otherwise, but the complaint, it's completely consistent with the complaint that 30 of the 34 successful applicants are black-led and black-owned and black community-directed because they could only find four of them to try to identify as comparators. That does not make for a classic equal protection claim in any context to identify the comparator who is not of your suspect class who was treated better. Okay. We have held you far over your time. We appreciate your patience as well. Thank you for your tolerance. Mr. Leroux, you've got five minutes of rebuttal time. Very good. Let me address the due process, count number two. You say you have a contract. You admit, I think, in your papers that you have to have a property interest. We were given a contract. It was signed. One step at a time. You acknowledge that in order to have a procedural due process claim, you have to have a property interest. I agree. And you claim your property interest is this contract that you signed, the others, the Pinalis didn't sign. That's correct. That's where we stand. So you don't have a claim for the denial of the second application because there was no contract. That's more associational, but it's not the due process claim. The due process claim goes... How about the due process? It's the two. Okay. So that's down to the contract, or what you refer to as the quasi-contract. Correct. And you feel it's an enforceable contract. Yes. Therefore, you have a property right. Yes. But the 11th Circuit has said, and you say they breached the contract. But isn't the precedent of this court that if you have such a breach of contract case, you can take the state court and that eliminates any claim you might be able to bring for a due process violation? We had given that some thought, but we felt because of the nature of the breach being from our perspective racial discrimination, that that gave us the ability to make that argument in a federal complaint. We didn't feel that we had to exhaust that remedy. Bottom line is you have to have a property interest. I would agree. And then if you have the right... The precedent of this court says if you have that right, you can get the recourse in state court and not under the due process. Again, the overarching facts of the case, as we've alleged in our complaint, were that the reason it was revoked, and I think if you look at the timing, that it was within two days after Latvala's e-mails, the text, the original text were I think on February 7th, and I think the contract was signed by the APEDF on February 9th. Oh, go ahead, please. Can I pivot back to the First Amendment question or issue for a minute? If we get all the way through sort of whatever the umber bar is or isn't, and now we're looking at the guts of the First Amendment claim, again, just to return to a question that Judge Kagan briefed and that we pursued with your adversary a little bit. So under any line of First Amendment precedent here with respect to grants or subsidies, it does seem like the Supreme Court is requiring a showing that there is an effective prohibition or coercion with respect to the associative activity that you claim you want to engage in. Can you just point me, you don't have to quote it for me, but can you just point me to the best sort of language or paragraph in the complaint that says we were effectively prohibited from associating with the Uhuru? I think in that count, again, it goes, and I just want to stress this. The Uhuru movement is something generic. What was researched and what was discussed were specific facts. In fact, even in the court's order, they referenced the pending criminal case involving members of the Uhuru organization. And I think that the issue there is that because the county based their determination on this association, the presumption is that the APDF is not going to get any consideration or any benefit or any treatment from the county that's going to be positive. Yeah, and I'm just trying to figure out how that cashes out in an effective prohibition on your ability to associate with anybody. And I just want to make sure that that is deleted in the complaint. I think I see some version of that in the brief, in your brief to us. I just want to make sure it's in the complaint. So I'm just wondering if you can point me to something in the complaint that says, here's how it cashed out in the real world. It was an effective prohibition on our ability to associate. I think it's couched in the terms of association with a disfavored group. That was the analysis that we included in the complaint. And we felt that that implicitly would bring into consideration that if we weren't associated with the disfavored group, we wouldn't have been essentially had the rights of the organization deprived by the county. I don't know that it really gets down to the forced discontinuation, but it clearly says that that association was a critical consideration by the county in making the determinations that it did. The other observations, and I think that I had written this down, but the court observed this, that the National Endowment case, I think, supports us entirely. And I think that even though the terms used to evaluate those subsidies, again, very different. And I just think that the distinction between the ARPA grant and certainly with UMBR being a job and things of that nature, I think there is a very dramatic distinction that needs to be considered in what we have presented here. From our perspective, we really deserve a chance to have this case tested in court. Maybe the complaint is not articulated perfectly, but I'd like to submit respectfully that there's enough in the way that the complaint is crafted and the allegations that are contained therein within the four corners of that complaint to avoid the penalty of being dismissed with prejudice at the point in time when it was. And I'd like to be able to convince this court that it should be remanded. The APDF should be given every opportunity to litigate this case, to do the discovery that I think would support, certainly from our perspective, the allegations that are And again, I just close, unless you have any further questions, with my deep gratitude for the privilege of being here today. Very well. Thank you both. Thank you. That was a marathon. You both put it yourselves well. Case is submitted and we are adjourned. All rise.